# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

| | | |
|---|---|---|
| LANETTE B. DEROSE, and | : | |
| THE ESTATE OF BENJAMIN | : | |
| TODD DEROSE, by and through | : | |
| RICHARD TODD DEROSE, | : | |
| Administrator, | : | |
| | : | COMPLAINT |
| Plaintiffs, | : | JURY TRIAL DEMANDED |
| | : | |
| v. | : | Case No. 5:22-cv-413 |
| | : | |
| CITY OF RALEIGH; DOORDASH, INC.; | : | |
| BEAVER CREEK LAND HOLDINGS | : | |
| LLC; CENTENNIAL LAND COMPANY; | : | |
| TIMOTHY WARREN "SAMMY" | : | |
| STEPHENS, in his official and individual | : | |
| capacities; and STACEY LEE STEPHENS, | : | |
| in her official and individual capacities, | : | |
| | : | |
| Defendants. | : | Electronically |

**COMPLAINT**

On a deadly October night in 2021, Raleigh and other local Defendants' failures to comply with their duties to maintain safe pedestrian conditions collided with DoorDash's self-created reputation for dashing food deliveries door to door and valuing speedy deliveries over the safety of pedestrians like Ben DeRose. This confluence of dangerous failures was not uncommon and, in fact, is likely duplicated every day. But commonness and vast repetition do not render these failures any less dangerous and do not make them lawful. And in this singular instance, they cost Ben DeRose his life and inflicted upon his family incalculable loss and damages.

Defendant City of Raleigh ("Raleigh") through its employees and agents, along with Defendants DoorDash, Inc., Beaver Creek Land Holdings LLC, Centennial Land Company, Timothy Stephens, and Stacey Stephens each failed in their duties to comply with local laws and regulations intended to maintain safe conditions for drivers and pedestrians. But for Raleigh's failure to properly delegate and supervise the tasks required to enforce the codes and ordinances painstakingly drafted and enacted to protect pedestrians, Ben DeRose would not have lost his life. But for the local Defendant property owners' and managers' failures to be familiar with and comply with their legal duties under Raleigh's Code and ordinances, Ben DeRose would not have lost his life. But for Defendant DoorDash undisguised need for speed and policies that encouraged and incentivized a delivery driver to make his

delivery that night within company time constraints while under threat of financial penalty or company termination, Ben DeRose would not have lost his life.

Plaintiff Lanette DeRose, Ben's mother, and Richard T. DeRose, Ben's father and Administrator of the Estate of Benjamin Todd DeRose, by and through their attorney, based upon their own knowledge of certain acts, and upon information and belief as to the acts of others, respectfully allege as follows:

## JURISDICTION AND VENUE

1.    Plaintiff Lanette DeRose brings this civil action as a legal resident and citizen of Santa Fe County, New Mexico.

2.    Richard DeRose as Administrator of Plaintiff Estate of Benjamin Todd DeRose brings this civil action as a legal resident and citizen of Santa Fe County, New Mexico.

3.    Defendant City of Raleigh ("Raleigh" or "the City") is a municipal corporation in Wake County organized and existing under the laws of the State of North Carolina.

4.    Defendant DoorDash, Inc. ("DoorDash") is a corporation with operations in the State of North Carolina, headquartered in San Francisco County, California, organized and existing under the laws of the State of Delaware.

5.     Defendant Beaver Creek Land Holdings, LLC ("BCLH") is a limited liability company in Wake County organized and existing under the laws of the State of North Carolina for the stated purpose of purchasing property. BCLH LLC's only members are Timothy Stephens and Shea Cardiff. BCLH LLC's registered agent is Timothy Stephens.

6.     Defendant Centennial Land Company ("CLC") was a rental property management company owned and managed by Defendants Timothy Stephens and/or Stacey Stephens in Wake County, North Carolina.

7.     Defendant Timothy Warren "Sammy" Stephens is a legal resident and citizen of Wake County, North Carolina.

8.     Defendant Stacey Lee Stephens is a legal resident and citizen of Wake County, North Carolina.

9.     Plaintiffs state causes of action under the laws of the State of North Carolina because the Defendants have violated rights secured thereunder. Plaintiffs' state law claims include wrongful death, negligence, negligence per se, gross negligence, civil conspiracy, and negligent infliction of emotional distress, and include claims for compensatory and punitive damages in excess of $75,000.

10.     Accordingly, Plaintiffs invoke this Court's diversity jurisdiction conferred by 28 U.S.C. § 1332, which gives district courts original jurisdiction over

all civil actions where the matter in controversy involves a claim of damages that exceeds the sum or value of $75,000 and is between citizens of different States.

11.     Because this Court has jurisdiction to address the controversy before it, 28 U.S.C. § 2201 grants the Court authority to declare the rights of the parties before it, and 28 U.S.C. § 2202 authorizes the Court to grant such further relief, including injunctive relief, as the Court may deem necessary and proper.

12.     Venue is proper in the Eastern District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial portion of the events, acts, and omissions giving rise to Plaintiffs' action occurred in Wake County, North Carolina.

## PARTIES

6.     Benjamin Todd DeRose, decedent, formerly a citizen and resident of Wake County, North Carolina, died intestate on or about October 18, 2021.

7.     Plaintiff Lanette B. DeRose is the mother of Ben DeRose. Lanette relocated from Raleigh to Santa Fe, New Mexico in 2020 with Ben's father, Richard T. DeRose.

8.     Richard T. DeRose is the father of Ben DeRose, has been lawfully appointed as an Administrator of the Estate of Benjamin Todd DeRose in Wake County File No. 21E-4511, and brings this action for wrongful death on behalf of the Estate. *(Exhibit 1)*

9.      Defendant City of Raleigh ("Raleigh" or "the City") is a municipal corporation and is liable as principal for all injuries/damages/death caused by the acts and omissions of Raleigh employees acting within the course and scope of their employment with the City. Raleigh had a legal duty to comply with laws and regulations established to preserve pedestrian safety, a legal duty to provide reasonably safe roadways for ordinary use, and a legal duty to safeguard against inherently dangerous or misleading conditions. At all relevant times, Raleigh was authorized to and did waive its immunity from civil liability in tort by the act of purchasing liability insurance and participating in a local government risk pool under N.C. Gen. Stat. § 160A-485.

10.      Defendant Beaver Creek Land Holdings, LLC ("BCLH") at all relevant times was owner of the property at 1400 Crest Road in Raleigh ("1400 Crest"). As the owner of 1400 Crest, BCLH had a legal duty to comply with all laws, codes, ordinances, and safety regulations related to that property. Timothy Stephens was listed in Secretary of State filings as the sole member and registered agent of BCLH.

11.      Defendant Centennial Land Company ("CLC") at all relevant times was the landlord and property manager for 1400 Crest. CLC's website advertised the rental properties CLC managed including 1400 Crest. CLC's website also had a photo of Timothy Stephens and Stacey Stephens alongside the biographies of both. Stacey Stephens was the CLC rental agent tenants dealt with. CLC leases directed

tenants to make rent payment checks payable to "Stacey Stephens." CLC leases stated that "[t]he Landlord shall, at the Landlord's expense, maintain the Premises in a safe, habitable and sanitary condition, and comply with all laws, ordinances and regulations pertaining to the condition of the Premises." CLC thereby assumed and/or had a legal duty to comply with all laws, ordinances and regulations pertaining to the condition of the premises.

12. Defendant Timothy Stephens was the "founder," member and registered agent for BCLH. As an individual owning and/or in control of the property at 1400 Crest, BCLH and/or CLC, Timothy Stephens had a duty to comply with all laws, codes, ordinances, and safety regulations related to the property.

13. Defendant Stacey Stephens was the CLC landlord and property manager for 1400 Crest, and the person who handled the day-to-day operations of accounting, bookkeeping and rental property management. As an individual with control of the property at 1400 Crest, and/or as an agent for the owner, Stacey Stephens had a duty to comply with all laws, codes, ordinances, and safety regulations related to the property.

## APPLICABLE LAW AND POLICY

14.     North Carolina wrongful death claims are based on statutory law, the claim must be in conformity with the requirements of the Act, codified as N.C. Gen. Stat. §28A-18-2.

15.     N.C. Gen. Stat. § 6-20 and § 7A-305(d) outline expenses, fees, and expenses recoverable in a civil suit for damages.


## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

16.     All allegations above are re-alleged and incorporated by reference.

17.     At approximately 2:45 a.m. on October 17, 2021, Benjamin Todd DeRose ("Ben") was on foot within sight of his home and lawfully crossing Crest Road ("Crest") where it meets Varsity Drive ("Varsity") in Raleigh, North Carolina. Ben had crossed the northbound lane of Crest and was crossing the southbound lane when he was struck by a 2008 Acura passenger car driven by Shawn Oster ("Oster") turning right from Varsity onto Crest. Oster had accepted and was delivering a DoorDash order when he struck Ben. Oster stopped and called 911.

18.     Multiple Raleigh Police Department ("RPD") and Raleigh Fire Department units responded. One of the RPD officers spoke calmly to Ben as he lay crumpled at the curb struggling to breathe. Other officers directed traffic, interviewed witnesses, and collected evidence. Wake County EMS responded from

their station located 200 yards north on Varsity and immediately began assessing and triaging Ben's injuries, which included but were not limited to the following:

    a.    Near amputation of his right arm;

    b.    Compound fracture of the humerus bone in his upper arm;

    c.    Fracture of his right humeral head;

    d.    16" laceration running from his shoulder to his elbow;

    e.    Acute C3 and C4 spine fractures;

    f.    Devastating traumatic brain injury;

    g.    16" degloving scalp laceration that exposed his skull;

    h.    Traumatic right pulmonary hemorrhage;

    i.    Mild left lung hemorrhage;

    j.    Acute fracture of his left inferior pubic ramus;

    k.    Fractured right clavicle; and

    l.    Massive blood loss.

19.    Ben was transported by EMS with an RPD emergency escort to Wake Med Hospital's Emergency Department on New Bern Avenue in Raleigh.

20.    Benjamin Todd DeRose was pronounced dead at 10:24 a.m. on October 18, 2021, an excruciating 32 hours after being struck down.

21.     Oster was charged with Misdemeanor Death by Motor Vehicle under N.C. Gen. Stat. § 20-141.4, and Failure to Reduce Speed to Avoid a Collision under N.C. Gen Stat. § 20-141.

22.     The RPD accident reconstruction unit concluded that Oster should have seen DeRose in the roadway with sufficient time to stop/avoid a collision.

23.     Oster pled responsible to "Failure to Reduce Speed in Order to Avoid a Collision," an infraction, in violation of N.C. Gen. State §20-141 on August 8, 2022. Ben's brother and sister were in court to witness the court order Oster to pay court costs of $180 and a $100 fine for his role in Ben's death.

24.      Benjamin DeRose was born in 2000 and was 21 at the time of his death. Ben's life expectancy, according to N.C. Gen. Stat. § 8-46, was another 56.0 years.

25.     Ben was a senior at North Carolina State University ("NCSU"). His parents accepted Ben's NCSU Bachelor of Science degree for him posthumously at his class's graduation ceremony in May 2022.

26.     Ben was also a valued employee at a local roofing company, a Boy Scouts of America Eagle Scout, an officer of his fraternity chapter, and a long-term resident of Raleigh.

27.     Varsity Drive and Crest Road meet at a Y-intersection, with Varsity at the bottom and top left of the Y, Crest at the top right of the Y, and the bottom of

the Y headed north. There were no traffic warning signs indicating the approach of a Y-intersection on southbound Varsity near or at Crest. Varsity and Crest at this intersection are both 27-foot wide, paved, two-lane, undivided public streets, with curbs and marked center lines, located within the Raleigh city limits. At this intersection, Varsity and Crest were public streets under the general authority and control of the City of Raleigh pursuant to N.C. Gen. Stat. § 160A-296.

28.     There were no marked crosswalks, traffic signals, or other traffic calming measures at the intersection of Varsity and Crest.

29.     The speed limit on Varsity and Crest was the city speed limit of 35 mph.

30.     There was a stop sign on northbound Crest at Varsity. A white stop line was painted on Crest perpendicular to the flow of traffic on Crest. The stop line was at or near the intersection with Varsity on the south side of Crest but was not parallel with the flow of traffic on Varsity due to the Y-angle of the intersection.

31.     There was a traffic sign visible to drivers on southbound Varsity like Oster indicating the approach of a perpendicular side street or entry on the right, to wit: "⊢", that referenced a perpendicular driveway entrance to a parking lot on the west side of Varsity, about 50 feet north of Crest. There were no other traffic calming devices, traffic signals, or directional signs in place to warn drivers on southbound Varsity of any dangerous conditions.

32.     There were no traffic calming devices, traffic signals, or directional signs in place to warn Ben or other pedestrians crossing Crest from south to north of any dangerous conditions.

33.     Raleigh and each North Carolina defendant had a duty to enforce and/or comply with laws, rules and regulations established for the purpose of maintaining safe conditions for vehicular and pedestrian traffic at the intersection of Crest and Varsity.

34.     Raleigh authorized and enacted laws, rules, and regulations through its Code of General Ordinances ("Code"), and the Raleigh Street Design Manual (July 1, 2018) ("RSDM"), and the Raleigh Tree Manual (2014, updated 2021) ("Tree Manual"), in conjunction with North Carolina Department of Transportation guidelines, all of which had the force of law in the City pursuant to N.C. Gen. Stat. § 160A-76.

35.     The RPD accident reconstruction unit report estimated that Oster was traveling at 35 mph when he struck Ben as he turned off of Varsity onto Crest.

36.     The RPD accident reconstruction unit report indicated that Ben was crossing Crest from south to north, near the painted stop line on Crest when he was struck.

37.     The North Carolina Office of the Chief Medical Examiner Report of Investigation by Medical Examiner reflected Ben's height was 5'6".

**Raleigh's Laws, Rules and Regulations Related to Pedestrian Safety**

38.     Raleigh's official public website[1] contained statements, diagrams and charts related to speed and pedestrian safety on City streets, including the following from the Raleigh Department of Transportation ("DOT") web pages:

a.   "Studies find a direct link between driver speed and severity of the crash when a crash between a pedestrian or cyclist with a vehicle occurs."

b.   The diagram below, reflecting the correlation between vehicle speed and pedestrian fatality.



---

[1] See https://raleighnc.gov. Last retrieved on September 29, 2022.

39. As such, according to Raleigh's website, with Oster driving the city speed limit of 35 MPH in the turn on Varsity at Crest, there was approximately a 60% chance his collision with Ben as a pedestrian would result in Ben's death.

40. The RSDM contained Raleigh's street design standards related to pedestrian safety on City streets.

41. The RSDM addressed "Sight Distance" in Article 12.6, which stated in pertinent part:

    a. "Sight distance is the length of roadway ahead visible to the driver. The minimum sight distance available on the roadway should be sufficiently long to enable a vehicle traveling at or near the design speed to stop before reaching a stationary object in its path."

    b. "Minimum stopping sight distance shall be provided in both the horizontal and vertical planes for planned roadways as related to assumed driver's eye height[2] and position."

    c. "Adequate sight distance should be provided at all driveway access points and shall be in accordance with the standards provided in this Manual." …

---

[2] The Federal Highway Administration's Manual on Uniform Traffic Control Devices on Streets and Highways indicates that the current average car driver's eye height is 3.5 feet or 42 inches.

d. "This note must be placed on all plans: <u>"Within the area of above defined sight triangle there shall be no sight obstructing or partly obstructing wall, fence, sign, foliage, berms or parked vehicles between the heights of 24 inches and eight feet above the curb line elevation or the nearest traveled way if no curbing exists."</u> (Emphasis in original.)

e. "Objects that can be permitted in the sight distance triangle are utilities such as hydrants, utility poles, utility boxes, GSI practices, and traffic control devices. Those objects must be located to minimize visual obstruction."

42. The RSDM addressed "Intersection Sight Distance" in Section 12.6.2 and stated in pertinent part:

a. "Intersections should be planned and located to provide as much sight distance as possible."

b. "Stopping sight distance on all approaches is needed as a minimum."

c. "Obstruction-free sight triangles shall be provided in both the horizontal and vertical planes, as related to assumed driver's eye height and position."

d. "At any intersection of two roadways, a sight triangle shall be provided for an unobstructed path of sight."

e.  "The sight distance triangle can be defined by connecting a point that is along the minor street's edge of pavement and 15 feet from the edge of pavement of the major street, with a point that is distance (L) along the major street's edge of pavement."

43.  The RSDM contained the diagram below in Section 12.6.1:

**Figure 7 Sight Distance Depiction**



44.  The RSDM contained Table 18 below in Section 12.6.1, as referenced in Figure 7:

**Table 18 Intersection Stopping Sight Distance**

| Speed limit (mph) | Minimum Intersection Sight Distance (ft) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2 Lane Undivided | | 3 Lane Undivided or 2 Lane Divided w/ 12' median | | 4 Lane Undivided | | 5 Lane Undivided or 4 Lane Divided w/ 12' median | |
| | LEFT TURN | RIGHT TURN | LEFT TURN | RIGHT TURN | LEFT TURN | RIGHT TURN | LEFT TURN | RIGHT TURN |
| 20 | 230 | 200 | 240 | 200 | 250 | 200 | 270 | 200 |
| 25 | 280 | 240 | 300 | 240 | 320 | 240 | 340 | 240 |
| 30 | 340 | 290 | 360 | 290 | 380 | 290 | 400 | 290 |
| 35 | 390 | 340 | 420 | 340 | 440 | 340 | 470 | 340 |
| 40 | 450 | 390 | 480 | 390 | 500 | 390 | 530 | 390 |
| 45 | 500 | 430 | 530 | 430 | 570 | 430 | 600 | 430 |
| 50 | 560 | 480 | 590 | 480 | 630 | 480 | 670 | 480 |
| 55 | 610 | 530 | 650 | 530 | 690 | 530 | 730 | 530 |

45.     As such, the RSDM states that the minimum intersection sight distance was 340 feet for right turns on two lane undivided roads with a speed limit of 35 mph, the road conditions that existed at Varsity and Crest.

46.     The design and/or maintenance of the intersection of the northwest corner of Varsity and Crest and the adjacent property was such that Oster had less than 340 feet of obstruction-free sight distance prior to striking Ben.

47.     The RSDM contained the diagram below related to sight distance measurement in a right hand curved turn in Section 12.6.1:

**Figure 6Sight Distance Measurement**



48. The RSDM contained Table 17 below in Section 12.6.1, as referenced in Figure 6:

**Table 17 Stopping Sight Distance**

| Speed limit (mph) | Minimum stopping sight distance (in feet), Street grade in percent | | | | | | |
|---|---|---|---|---|---|---|---|
| | Upgrades | | | Flat | Downgrades | | |
| | 9% | 6% | 3% | 0% | -3% | -6% | -9% |
| 25 | 140 | 145 | 150 | 150 | 155 | 165 | 175 |
| 30 | 180 | 185 | 200 | 200 | 210 | 215 | 230 |
| 35 | 225 | 230 | 240 | 250 | 265 | 275 | 290 |
| 40 | 270 | 280 | 290 | 305 | 315 | 335 | 355 |
| 45 | 320 | 330 | 345 | 360 | 380 | 400 | 430 |
| 50 | 375 | 390 | 405 | 425 | 450 | 475 | 510 |

49. As such, the RSDM states that the minimum stopping sight distance on a flat road for vehicles traveling 35 mph, the road conditions existing at the intersection at Varsity and Crest, is 250 feet.

50. The design and/or maintenance of the intersection at the northwest corner of Varsity and Crest and adjacent property was such that Oster had less than 250 feet of obstruction-free sight distance in which to stop prior to striking Ben.

51. On October 17, 2021, several objects located in the open area at or above street level at 1400 Crest obstructed or partially obstructed Oster's vision of Ben on Crest while he was approaching the intersection on Varsity. Those objects included:

    a. Three mature trees up to 25 feet tall with trunks that were four to eight inches in diameter;

    b. Three established shrubs four to five feet tall that measured four to six feet deep and six to eight feet wide; and

    c. A car parked in the private parking lot space closest to Varsity that was at least four feet in height.

52. Raleigh's Code contains ordinances or code provisions related to public nuisances, vision obstructions and pedestrian safety on Raleigh's streets. Code Ch. 6, Part 12, is titled "Health, Sanitation and Public Nuisance," § 12-6002 states in pertinent part:

Nuisances Prohibited and Enumeration.

Any of the following enumerated and described conditions occurring in an open place is hereby found, deemed, and declared to constitute a detriment, danger and hazard to the health, safety,

morals, and general welfare of the inhabitants of the City and is found, deemed, and declared to be public nuisances wherever the same may exist and the creation, maintenance, or failure to abate any nuisances is hereby declared unlawful. …

(p) Any condition whereby any person owning or having the legal control of any land within the corporate limits of the City maintains or permits upon any such land any fence, sign, billboard, shrubbery, bush, tree, mailbox, or other object or combination of objects which obstructs the view of motorists using any street, private driveway, or approach to any intersection adjacent to or abutting such land so as to constitute a traffic hazard as a condition dangerous to public safety upon any such street, private driveway, or at any such street intersection.

53.    Public nuisance conditions that existed on the property at 1400 Crest, adjacent to the intersection of Crest and Varsity, included shrubbery, bushes, trees, and parked cars. Those objects, individually and collectively, obstructed the view of motorist Oster on Varsity approaching the intersection of Varsity and Crest so as to constitute a traffic hazard as a condition dangerous to public safety and the safety of pedestrian Ben.

54.    Code, Sec. 12-6001 states the responsibility for "the identification of the *nuisances* as described in §12-6002(p) *shall* be the responsibility of the Public Works Director or [their] designee." (Emphasis in original.)

55.     Code, Ch. 8, Part 9 is titled "Trees and Vegetation" and, along with its reference companion publication the "Tree Manual," regulates the maintenance standards for trees and vegetation in Raleigh, and states in pertinent part:

    a.  Code, Sec. 9-8006 and Tree Manual Ch. 4, Sec. B.1. describe private property owner responsibility for maintaining trees and vegetation originating on private property to ensure clear and safe passage for vehicular and pedestrian traffic in the right of way.

    b.  Code, Sec. 9-8007 and Tree Manual Ch. 4, Sec. B.2. permit the City of Raleigh Urban Forester to order the removal of trees and shrubs, or to conduct removal or pruning of trees of shrubs that amount to a public nuisance.

    c.  Tree Manual, Ch. 4, Sec. B.2.f.i. states that "[a]ny vegetation that poses a visual obstruction for pedestrian or vehicular traffic shall be reviewed by the Raleigh Department of Transportation."

    d.  Tree Manual, Ch. 5, Sec. A.2.a. states "[i]t is the property owner's responsibility to prune trees and vegetation originating on private property for the clear and safe passage of pedestrian and vehicular traffic in the right of away and adjacent public property."

e.  Tree Manual, Ch. 5, Sec. B.2. indicates that city of Raleigh pruning standards include: "Prune to maximize clearance and visibility for vehicular and pedestrian traffic."

f.  Tree Manual, Ch. 5, Section C relates to sight distance requirements and states:

  i.  "Sight Triangle: Landscaping shall not obstruct the views of motorists using any street, driveway, parking aisles or the approach to any street intersection."

  ii.  "All landscaping installations must comply with the sight triangle requirements of the [RSDM] and/or the [NC DOT] guidelines."

  iii.  "All trees and vegetation within the sight triangle, both on city and private property shall be kept pruned so as not to substantially obstruct the view of traffic."

  iv.  "Vegetation shall be maintained lower than 24 inches and higher than 8 feet in accordance with the [RSDM]."

56.  Trees and vegetation on the property at 1400 Crest adjacent to the intersection of Varsity and Crest were not pruned or maintained lower than 24 inches and higher than 8 feet, did not ensure clear and safe passage for vehicular and

pedestrian traffic in the right of way, and substantially obstructed the view of Oster and Ben as vehicular and pedestrian traffic on Varsity and Crest.

## FIRST CAUSE OF ACTION
## NEGLIGENCE AND GROSS NEGLIGENCE
(v. Defendant Raleigh)

57.     All allegations in Paragraphs 1 through 56 are re-alleged and incorporated by reference.

58.     At all relevant times, Raleigh's City Manager was Marchell Adams-David, an employee and agent of Raleigh whose duties included coordinating and overseeing the activities of all City departments including the Raleigh Department of Transportation ("DOT") and Department of Housing and Neighborhoods ("DHN") to ensure compliance with the law and pursuant to directives of the Raleigh City Council.

59.     The work and/or supervision Adams-David did or did not do for Raleigh in connection with overseeing the DOT and DHN was the same or similar type of work and/or supervision that is done by people who work in the private sector. Adams-David was not an elected official. His job was not created by statute, did not require him to take an oath, and was not a job that allowed them to exercise the sovereign powers of the State of North Carolina.

60.     At all relevant times, Raleigh's Director of DOT was Michael Moore, a Raleigh employee and agent who reported to City Manager Adams-David, or their designee. The installation and maintenance of traffic calming measures and traffic warning signs was an activity performed by Raleigh's DOT. The work and/or supervision that Moore did or did not do in connection with overseeing the DOT were the same or similar type of work and/or supervision that is done by people who work in the private sector. Moore was not an elected official. His job was not created by statute, did not require him to take an oath, and was not a job that allowed him to exercise the sovereign powers of the State of North Carolina.

61.     At all relevant times, Raleigh's Director of DHN was Larry Jarvis, a Raleigh employee and agent who reported to Adams-David, the City Manager, or their designee. Identifying non-compliance with and enforcing compliance with public nuisance ordinances and abating public nuisance conditions were activities performed by Raleigh's DHN and/or Raleigh's Public Works Director. The work and/or supervision that Jarvis did or did not do for Raleigh in connection with overseeing the DHN was the same or similar type of work and/or supervision that is done by people who work in the private sector. Jarvis was not an elected official. His job was not created by statute, did not require him to take an oath, and was not a job that allowed him to exercise the sovereign powers of the State of North Carolina.

62. The activities necessary to order, supervise, coordinate, and/or perform the identification and/or abatement of public nuisance conditions at 1400 Crest, and the activities necessary to order, supervise, coordinate, and/or perform the installation of traffic calming measures in the vicinity of 1400 Crest were activities that were commonly performed by Raleigh, Adams-David, Moore, and/or Jarvis.

63. Prior to October 17, 2021, and at all times pertinent to this action, Defendant Raleigh and its agents committed one or more of the following acts or omissions in derogation of its official duties:

    a. Failed to establish, implement, and/or supervise any means by which drivers on Varsity including Oster were warned or given notice of the approaching a Y-intersection right turn on Varsity at Crest,

    b. Failed to plan for, initiate, supervise, and/or deploy employees to identify public nuisance conditions on property adjacent to the intersection of Varsity and Crest on the corner at 1400 Crest, when such conditions caused vision obstructions for drivers on Crest and Varsity.

    c. Failed to plan for, initiate, supervise, and/or implement the abatement of public nuisance conditions that existed on property adjacent to the intersection of Varsity and Crest on the corner at 1400 Crest, including vision obstructions that existed in the space between the height of 24 inches and eight feet.

d.     Failed to plan for, coordinate, and/or supervise Raleigh employees to enforce laws, rules and regulations authorized and established by Raleigh for public policies promoting pedestrian safety, by elimination of public nuisance conditions and vision obstructions, and establishing safe driver sight triangles and sight distance against the property owner of 1400 Crest.

e.     Failed to plan for, identify, review, and/or comply with City of Raleigh safety and design directives in the RSDM related to establishing stopping distance, sight distance, obstructed vision, and sight distance triangles on property adjacent to the Crest and Varsity intersection.

f.     Failed to create or implement a plan for the period after the street design phase to coordinate continued compliance with City of Raleigh safety and design directives in the RSDM related to establishing stopping distance, sight distance, obstructed vision, and sight distance triangles on property adjacent to the Crest and Varsity intersection.

g.     Failed to plan for, initiate and/or coordinate employees to install any traffic warning mechanism to notify Ben as a pedestrian crossing Crest that the vision of drivers on southbound Varsity was obstructed.

h.    Constructively condoned and ratified the creation, maintenance and/or failure to abate public nuisance conditions on property adjacent to the intersection of Crest and Varsity at 1400 Crest through a lack of enforcement of its own laws, rules and regulations created for pedestrian safety.

i.    Was otherwise negligent as will be shown through discovery and proven at trial of this action.

64.    Raleigh had actual or constructive notice of the dangerous conditions existing on property at or adjacent to the intersection of Varsity and Crest as such dangerous conditions were present and permitted to continue for a period of time sufficient to allow vegetation to experience significant growth. The dangerous public nuisance conditions included three four to five foot tall shrubs and three mature trees and a parked car within the designated sight triangle area for drivers like Oster on Varsity when objects in the space between two feet above ground level and eight feet above ground level were prohibited.

65.    Raleigh knew or should have known its acts and omissions in the area of pedestrian safety and in derogation of Raleigh Code sections would be reasonably likely to result in injury or death. As such, those acts and omissions constituted willful or wanton conduct and gross negligence.

66.     Some or all of the acts and omissions of Raleigh and its agents demonstrated a conscious or intentional disregard or indifference to the rights and safety of others, including Ben DeRose.

## SECOND CAUSE OF ACTION
## NEGLIGENCE, NEGLIGENCE PER SE, GROSS NEGLIGENCE, and CIVIL CONSPIRACY
### (v. Beaver Creek Land Holdings LLC, Centennial Land Company, Timothy Stephens & Stacey Stephens)

67.     All allegations in Paragraphs 1 through 66 are re-alleged and incorporated by reference.

68.     In the time period between December 8, 2020 and October 17, 2021, and at all times relevant to this action, Defendants violated Raleigh Code provisions and other laws related to pedestrian safety and public nuisance conditions on the property at 1400 Crest, when such laws were designed to protect against harm to pedestrians like the decedent who was a person the law was designed to protect.

69.     In the time period between December 8, 2020 and October 17, 2021, and at all times pertinent to this action, each Defendant committed one or more of the following acts or omissions:

        a.      Failed to plan for, coordinate, supervise, order and/or perform landscape maintenance at 1400 Crest necessary to eliminate vision obstructions caused by shrubbery, hedges and mature trees existing in

the space between 24 inches and eight feet in height above ground level for drivers and pedestrians on Varsity and Crest as required by law under Raleigh Code sections enacted for the protection of pedestrians;

b.      Failed to identify, plan for, or eliminate vision obstructions in the space between 24 inches and eight feet in height for drivers and pedestrians on Varsity and Crest caused by parked cars in the private parking lot at 1400 Crest as required by law under Raleigh Code sections enacted for the protection of pedestrians;

c.      Failed to identify laws, rules and regulations authorized and enacted by Raleigh regarding the duty of property owners and those in control of property to keep driver sight triangles clear of vision obstructions for the safety of pedestrians and others on the corner of Varsity and Crest at 1400 Crest, and did, in fact, act or fail to act in violation of those laws; and

d.      Were otherwise negligent as will be shown through discovery and proven at trial of this action.

70.     Defendants had actual or constructive notice of the dangerous conditions existing at 1400 Crest. The dangerous public nuisance conditions included four to five foot tall shrubs and mature trees within the designated sight triangle area for drivers on Varsity when objects in the visual space between two

feet and eight feet above ground level were prohibited. Such dangerous conditions were present and permitted to continue for a period of time that allowed the shrubs and trees to experience significant growth over 24 inches in height.

71.     Defendants knew or should have known their acts or omissions in the area of pedestrian safety would be reasonably likely to result in injury or death, and as such those acts and omissions constitute willful or wanton conduct and gross negligence.

72.     Some or all of the acts and omissions of Defendants BCLH, CLC, Timothy Stephens, and Stacey Stephens demonstrated a conscious or intentional disregard or indifference to the rights and safety of others, including Ben DeRose.

**THIRD CAUSE OF ACTION**
**NEGLIGENCE AND GROSS NEGLIGENCE**
(v. DoorDash, Inc.)

73.     All allegations in Paragraphs 1 through 72 are re-alleged and incorporated by reference.

74.     On October 17, 2021, Shaun Oster was working as a DoorDash delivery driver classified by DoorDash as an independent contractor.

75.     Oster had accepted a delivery request through the DoorDash phone application, had picked up the DoorDash food order at McDonald's on Western

Boulevard in Raleigh, was on his way to deliver the order to a DoorDash customer, and had not yet completed that delivery when he struck Ben with his car.

76.     DoorDash was a business that provided an online marketplace platform using web-based technology that connected consumers, restaurants and/or other businesses, and delivery driver contractors for on-demand delivery.

77.     DoorDash had contracted for one or more insurance policies to insure against its liability for all sums it legally must pay as damages and costs, and various coverages related to commercial automobile exposures, including liability coverage for damages for bodily injury, including death, within the United States. DoorDash contracted with Voyager Indemnity Insurance Company in Miami, Florida for one or more of those insurance policies.

78.     Oster, as a delivery operator, was considered an insured under one or more insurance policies contracted for by DoorDash.

79.     Oster's vehicle was considered a covered auto under one or more insurance policies contracted for by DoorDash as an auto owned and being used by a delivery operator.

80.     DoorDash was an insured under one or more insurance policies as a party liable for the conduct of Oster, an insured.

81.     DoorDash's software notifies hovering delivery drivers like Oster located in DoorDash-designated hot spots that a nearby delivery opportunity is available and facilitates completion of the delivery.

82.     DoorDash's consumer website[3] and its iOS and Android consumer and Dasher delivery phone applications ("apps") coordinate and facilitate the contracted service of delivery of restaurant food via delivery drivers by transmitting the order details to individual delivery drivers, including Oster in this instance.

83.     When a Dasher accepts a delivery opportunity on their phone, DoorDash's Dasher app brings up an integrated form of the Google Maps app on the phone to give the driver directions and the estimated time of arrival at the pick-up location. Once the order is marked as picked up, DoorDash's Dasher app brings up the Google Maps app again to give the driver directions and estimated time of arrival at the delivery location.

84.     DoorDash's website, apps, marketing, and delivery driver communications give the public the impression, through various uses of the word "dash" and references to relative speed, such as "Get what you need faster with quick and easy ordering," that consumers can expect their "on-demand" DoorDash deliveries to be completed swiftly.

---

[3] See https://www.doordash.com/. Last retrieved September 29, 2022.

85. DoorDash's website, apps, and marketing contained multiple words, phrases and features that bolster the idea that consumer expectation of fast delivery by displaying the following:

    a. Categories of restaurants, including "Fastest Near You";

    b. Delivery windows that can be requested by a consumer ranging from "ASAP" to times listed for other days; and

    c. Individual restaurant delivery times customers can choose from updated in real time online and in the DoorDash apps in increments of one minute.

86. The first four words at the top of the DoorDash consumer website are "DOORDASH," "Delivery," "Pickup," and "ASAP." (Emphasis in original.)

87. DoorDash refers to its delivery contactors as "Dashers."

88. Dashers may deliver by car in Raleigh, but not by bike or on foot.

89. Dashers are compensated by DoorDash for each delivery completed.

90. Consumers may tip Dashers by adding gratuities before or after deliveries are completed through the DoorDash apps or website.

91. Consumers may rate Dashers after deliveries are completed by adding Dasher ratings from one to five in the DoorDash apps or website.

92. Dashers with an overall customer rating of less than 4.2 are deactivated on the DoorDash platform.

93. Dashers arriving at a merchant or customer location more than 5 minutes after the estimated pick up or drop off time are eligible to be deactivated on the platform.

94. DoorDash effectively developed a set of Dasher policies that:

    a. Minimized Dashers' earning potential in tips if consumer expectations for delivery speed were unmet;

    b. Incentivized Dashers with the lure of better tips to meet consumer expectations for speed;

    c. Minimized Dashers' potential for high customer ratings if consumer expectations for delivery speed were unmet;

    d. Incentivized Dashers with the lure of better ratings to meet consumer expectations for speed;

    e. Penalized Dashers not meeting specific customer rating targets with deactivation on the platform; and

    f. Penalized Dashers not meeting specific timing targets with the threat of deactivation on the platform.

95. DoorDash developed and used a corporate marketing strategy that created a consumer expectation that their DoorDash orders would be swiftly delivered or "dashed" to their doors.

96.     This suit arises directly from DoorDash's actions offering and facilitating a means of making door-to-door deliveries to Oster.

97.     Some or all of DoorDash's acts and/or omissions demonstrated a conscious or intentional disregard or indifference to the rights and safety of others, including Ben DeRose.

98.     DoorDash knew or should have known that its acts and omissions related to pitching its business to consumers and delivery drivers under the marketing umbrella of speed, would be reasonably likely to result in injury or death, and as such constituted willful or wanton conduct.


## FOURTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (v. All Defendants)

99.     All allegations in Paragraphs 1 through 98 are re-alleged and incorporated by reference.

100.    Some or all of each defendant's acts and/or omissions above were done in breach of a general legal duty owed to Ben and others to create, oversee, and/or maintain safe premises and roadways for pedestrians including Ben in the area adjacent to the intersection of Crest and Varsity as established by Raleigh's Code. Specifically:

a. At 1400 Crest, Defendants Raleigh, BCLH, CLC, Timothy Stephens, and Stacey Stephens failed to identify and/or abate public nuisances and unsafe conditions for pedestrian and vehicular traffic.

b. DoorDash designed and used policies, marketing, and software that valued presenting an image of speed to the public over safety.

101. It was reasonably foreseeable that the failure to enforce or comply with Raleigh's safety laws, rules and regulations would expose pedestrians, including Ben to risk of injury and/or death and that such outcome would cause severe emotional distress to a victim including Ben, and/or his survivors.

102. It was reasonably foreseeable that DoorDash's use of policies, marketing and software that valued speed over safety would expose pedestrians, including Ben to risk of injury and/or death and that such outcome would cause severe emotional distress to a victim including Ben, and/or his survivors.

103. Some or all of each defendant's acts and/or omissions above were done in a way that demonstrated a conscious or intentional disregard or indifference to the rights and safety of pedestrians, including Ben DeRose.

104. Defendants' acts and/or omissions above that led to Ben's untimely and brutal death caused Ben's mother Plaintiff Lanette DeRose to suffer difficulties with sleep, loss of focus, inability to concentrate, increased anxiety, inability to experience joy in life activities, chronic depression, and severe emotional distress.

# FIFTH CAUSE OF ACTION
## WRONGFUL DEATH
### (v. City of Raleigh)

105. All allegations in Paragraphs 1 through 104 are re-alleged and incorporated by reference.

106. Defendants systemically failed to direct or supervise Raleigh employees and agents Adams-David, Moore, and Jarvis to adequately:

        a.      Plan for, coordinate, or install Y-intersection warning signs for the blind right hand turn on Varsity;

        b.      Plan for, review, or identify public nuisances on the northwest corner of Varsity and Crest that obstructed the vision of drivers on Varsity, including Oster, and pedestrians, including Ben;

        c.      Plan for, identify, or abate public nuisance vision obstructions at the 1400 Crest property adjacent to Varsity that obstructed the vision of drivers on Varsity, including Oster, and pedestrians, including Ben;

        d.      Plan for, supervise, or install traffic warning devices or some other means of notice to warn drivers on Varsity, including Oster, and pedestrians, including Ben, of the vision obstructions and the blind turn at Varsity and Crest; and

e.    Plan for, supervise, or install traffic warning devices or some other means of notice to warn pedestrians crossing Crest, including Ben that the vision of drivers on southbound Varsity was obstructed,

107.   As a direct and proximate result of the above failures, Oster was not given notice and was unaware that he did not have an adequate sight line to see Ben, a man of short stature, in the road on Crest behind the sight obstructions on the corner at the 1400 Crest property, in time to stop before hitting him, and Oster struck Ben causing Ben's death.

108.   The acts and omissions of Raleigh enumerated above were the proximate cause of Ben's injuries and death. Defendant Raleigh knew or should have known that the injuries Ben suffered, and his subsequent death were a foreseeable outcome of their acts and omissions.

## SIXTH CAUSE OF ACTION
## WRONGFUL DEATH and CIVIL CONSPIRACY
(v. Beaver Creek Land Holdings LLC, Centennial Land Company, Timothy Stephens & Stacey Stephens)

109.   All allegations above are re-alleged and incorporated by reference.

110.   Each defendant had ownership or control of the property at 1400 Crest and had a legal duty to maintain the property in a safe condition in compliance with Raleigh Code sections.

111.   BCLH, CLC, Timothy Stephens and/or Stacey Stephens were aware that the property on the corner of 1400 Crest had landscape maintenance needs and parking lot oversight needs that they were obligated to provide.

112.   BCLH, CLC, Timothy Stephens, and/or Stacey Stephens supervised, performed, or contracted for landscape maintenance services at 1400 Crest.

113.   BCLH, CLC, Timothy Stephens, and/or Stacey Stephens conspired with any one or more of the other defendants and/or third parties to perform landscape maintenance on the property at the corner at 1400 Crest in an unlawful way, to wit: in violation of Raleigh Code sections and General Ordinances requiring hedges and trees to be maintained or removed to create clear sightlines in the space between 24 inches and eight feet for drivers and pedestrians on Varsity and Crest.

114.   BCLH, CLC, Timothy Stephens, and/or Stacey Stephens controlled access to the parking spaces in the private parking lot and the reserved spaces for vehicles of tenants at 1400 Crest.

115.   BCLH, CLC, Timothy Stephens, and/or Stacey Stephens conspired with any one or more of the other defendants and/or third parties to control reserved tenant parking spaces in the private parking lot at 1400 Crest in an unlawful way, to wit: in violation of Raleigh Code sections by not providing for clear sightlines for drivers on Varsity of obstacles or pedestrians in the road on Crest.

116. BCLH, CLC, Timothy Stephens, and Stacey Stephens' engaged in actions or inactions, to wit: their collective failures to:

a. Plan for, review, and comply with the laws, rules and safety regulations authorized and published by Raleigh regarding driver sight triangles, sight distance, and vision obstructions for the property at 1400 Crest;

b. Review and identify existing public nuisance conditions on the corner at 1400 Crest that obstructed or partially obstructed the vision of drivers on Varsity including Oster approaching Crest; and

c. Plan for and coordinate the abatement of existing public nuisance conditions on the corner at 1400 Crest that obstructed the vision of drivers on Varsity including Oster.

117. As a direct and proximate result of those actions and inactions, Oster did not have an adequate clear sight line to see Ben on Crest in time to stop his car before hitting him and causing his injuries.

118. Defendants' acts and omissions enumerated above were a proximate cause of Ben's injuries and death.

119. Defendants knew or should have known that the injuries and death Ben suffered were a foreseeable outcome of their acts and omissions.

## SEVENTH CAUSE OF ACTION
## WRONGFUL DEATH
(v. DoorDash, Inc.)

120.   All allegations in Paragraphs 1 through 119 are re-alleged and incorporated by reference.

121.   Ben suffered damages, injury, and death as a direct and proximate result of DoorDash's actions and inactions, to wit: the design and use of company policies and marketing strategies that intentionally or negligently:

    a.  Created inflated customer expectations for delivery speed;

    b.  Created an incentive for Dashers to meet or exceed inflated customer expectations, by pressuring Dashers including Oster for fast delivery speeds, to thereby receive higher customer ratings, to preserve their positions as Dashers;

    c.  Pressured and penalized Dashers including Oster who did not meet inflated customer expectations, and thereby received lower customer ratings and placed them at risk of termination from the platform;

    d.  Pressured and incentivized Dashers including Oster to meet or exceed customer expectations related to fast delivery speeds, whereby Dashers would be financially rewarded by customers for

meeting or exceeding those expectations with increased tip income; and

e. Pressured and penalized Dashers including Oster who insufficiently met customer expectations related to fast delivery speed and thereby received reduced tip income.

122.   DoorDash's acts and omissions enumerated above created a culture of artificially inflated customer expectations, incentivized Dashers including Oster to maximize their tips and ratings through meeting or exceeding the inflated customer delivery speed expectations created by DoorDash, and penalized Dashers including Oster with the threat of termination from the platform and reduced tip income for failing to meet the inflated expectations created wholly by DoorDash.

123.   DoorDash's corporate culture of inflated customer expectations, and the pressure on Dashers like Oster to pick up and deliver orders with haste, caused Oster to work with more speed than was prudent, and to fail to reduce his speed in order to avoid colling with Ben, and was a proximate cause of Ben's injuries and death.

124.   DoorDash knew or should have known that the injuries and death Ben suffered were a foreseeable outcome of its acts and omissions.

125. Ben's injuries and subsequent death were a foreseeable outcome of those policies, strategies, acts, omissions, and DoorDash's institutional and ubiquitous need for speed.

## **DAMAGES**

126. All allegations in Paragraphs 1 through 125 are re-alleged and incorporated by reference.

127. As a direct and proximate result of Ben's injuries sustained when Oster struck him down on Crest at Varsity, and of Ben's death thereafter:

    a. Ben received medical care and incurred medical expenses;

    b. Ben's parents paid funeral expenses;

    c. Ben experienced pain and suffering; and

    d. Ben's father Richard T. DeRose and his mother Lanette B. DeRose sustained grievous personal loss and damages.

128. The Estate of Benjamin Todd DeRose, through its Administrator Richard DeRose and Lanette DeRose are entitled to seek recovery of all damages specified in North Carolina Gen. Stat. § 28A-18-2.

**Election of Remedies**

129.    All theories of liability above are pled cumulatively and alternatively, with no election of remedies until such time as the trier of fact has resolved disputed issues of fact and the Court compels such an election, if, in fact, the Court does so.

WHEREFORE, having stated claims against the defendants, Plaintiffs pray that they have and recover of Defendants, jointly and/or severally as follows:

1.    Compensatory damages pursuant to N.C. Gen. Stat. § 28A-18-2(b) to include:

    a.  Expenses for Ben's care, treatment and hospitalization incident to the injury resulting in Ben's death;

    b.  Compensation for Ben's pain and suffering;

    c.  Ben's funeral expenses;

    d.  The present monetary value of the decedent to his parents to include loss of Ben's reasonable expected net income, and Ben's services, protection, care, and assistance; and

    e.  The loss of Ben's society, companionship, comfort, guidance, kindly offices, and advice to his parents.

2.    Punitive damages from each Defendant, pursuant to N.C. Gen. State § 1D-15.

3.     For the costs, counsel fees, and expenses of this action as allowed for under N.C. Gen. Stat. § 6-20 and § 7A-305(d), including interest as allowed by law.

4.     For such other and further relief as the court may deem just and proper.

5.     For a trial by jury of all issues so triable herein.


Respectfully submitted,

This 10th day of October 2022.

KERSTIN WALKER SUTTON PLLC

Kerstin Walker Sutton
Attorney for Plaintiff
NCSB #30008
Durham, NC 27712-3020
(919) 617-0009
kws@kwsutton.com

## CERTIFICATE OF SERVICE

I certify that on October 10, 2022, I caused a true and correct copy of the foregoing Complaint to be served upon all Counsel of Record via the Court's ECF/CM system.

_____
Kerstin W. Sutton
Counsel for the Plaintiff

KERSTIN WALKER SUTTON PLLC
3215 Deerchase Wynd
Durham, NC 27712-3020
(919) 617-0009
kws@kwsutton.com
NC State Bar 30008